IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICK J. MCCOY,                      )
                                       )
        Plaintiff,                     )
                                       )
        vs.                            )     Civil Action No. 07-73
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
        Defendant.                     )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Patrick J. McCoy and Defendant Michael
J. Astrue, Commissioner of Social Security. Plaintiff seeks review
of final decisions by the Commissioner denying his claims for
disability insurance benefits ("DIB") under Title II of the Social
Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security
income benefits ("SSI") under Title XVI of the Social Security Act,
42 U.S.C. §§ 1381 *et seq.*  For the reasons discussed below,
Defendant's motion is granted and Plaintiff's motion is denied.

### II.   BACKGROUND

#### A.    Factual Background

Patrick J. McCoy was born in September 1958 and graduated
from high school in 1976, having received special training as an
auto mechanic. (Certified Copy of Transcript of Proceedings before

1

the Social Security Administration, Docket No. 8, "Tr.," at 91.)
For almost 25 years, he worked at several different jobs, including
landscaper, machine operator, cleaner, and gas station attendant.
In June 1998, while working in a plastics plant, he was injured
when the arm of a molding machine struck him in the back, pinning
him to the machine. (Tr. 189.) He was initially diagnosed with
blunt abdominal trauma, possible lumbar fracture, abrasions, scalp
lacerations and a possible concussion. (Tr. 190.) Following an
orthopedic consultation, however, it was determined that he had a
contusion of his lumbar spine but no spinal fracture, acute
abdominal trauma or head injury. (Tr. 191, 193.) He apparently
returned to work soon after with no obvious physical problems.

His work and medical history continued to be unremarkable
until the summer of 2001 when Mr. McCoy entered a drug and alcohol
rehabilitation program. Following that treatment, he worked in a
series of short-term jobs until July 15, 2004, when Plaintiff
reportedly stopped working due to chronic panic attacks. (Tr. 86.)

B. Procedural Background

On May 20, 2005, Mr. McCoy applied for disability and
supplemental security income benefits, claiming disability
beginning June 1, 2001, due to depression and anxiety. (Tr. 217
and 58, respectively.) Both applications were initially denied on
August 15, 2005 (Tr. 31-34; 221-225), after which Plaintiff timely
requested a hearing before an Administrative Law Judge ("ALJ.")

2

On July 11, 2006, a hearing was held before the Honorable John J. Mulrooney at which Plaintiff was represented by counsel; his wife (from whom he is separated) and a friend in whose house he rents a room also testified. Judge Mulrooney issued his decision on August 23, 2006, again denying DIB and SSI benefits. (Tr. 12-22.) The Social Security Appeals Council declined to review the ALJ's decision on January 26, 2007, finding no reason pursuant to its rules to do so. (Tr. 5-7.) Therefore, the August 23, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on April 2, 2007, seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to

3

support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel,

4

228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[1] currently existing in the national economy.[2] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. McCoy satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured will be December 31, 2008.

---

[1] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[2] The claimant seeking supplemental security income benefits must also show that his income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

To determine a claimant's rights to either SSI or DIB,[3] the ALJ conducts a formal five-step evaluation:

(1)   if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)   if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5)   if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[4] Sykes

---

[3]   The same test is used to determine disability for purposes of receiving either type of Social Security benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

[4]   Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S.

<u>v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Mulrooney first concluded that Mr. McCoy had not engaged in substantial gainful activity since allegedly becoming disabled on June 1, 2001. (Tr. 14-15.) Although Plaintiff's earnings record showed he had worked intermittently between 2001 and 2004 (*see* Tr. 65-69), the ALJ concluded his income did not rise to the level of "substantial gainful activity" as that term is defined in 20 C.F.R. §§ 404.1574 and 416.974.[5] (Tr. 14-15.) Resolving step two in Plaintiff's favor, the ALJ found that his severe impairments included major depressive disorder, dysthymia,[6] panic disorder with agoraphobia, alcohol dependence, and opiate and benzodiazepine[7] abuse. (Tr. 15.) At step three, the ALJ concluded that Plaintiff's impairments, either alone or in combination, did not meet or

---

137, 146-147 n.5 (1987).

[5]  The Administration has established an upper limit for income a claimant may receive without those earnings giving rise to the conclusion that he has performed substantial gainful activity ("SGA"). Since June 1999, this amount has been increased by formula from a basis of $700 per month. *See* 20 C.F.R. § 416.974 and SGA calculator at www.ssa.gov/OACT/COLA/sga.html, last visited April 7, 2008.

[6]  Dysthymia is defined as "a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (such as eating and sleeping disturbances, fatigue, and poor self-esteem.)" *See* medical dictionary on the National Institute of Medicine's on-line website, MedlinePlus, www.nlm.nih.gov/medlineplus (last visited April 8, 2008), "MedlinePlus."

[7]  Benzodiazepines are any of a family of minor tranquilizers that act against anxiety and convulsions and produce sedation and muscle relaxation. THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 4th ed., at http://dictionary.reference.com/browse/benzodiazepine, last visited April 2, 2008.

7

medically equal any of the criteria in Listing 12.00, specifically, Listing 12.04, affective disorders; 12.06, anxiety-related disorders; or 12.09, substance addiction disorders, or any of the other impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. He also considered Plaintiff's history of pancreatitis, hypertension, and back injury, but concluded those conditions were not "severe" as that term is defined by the Social Security Administration.[8] (Tr. 15; 17.)

At step four, the ALJ concluded Mr. McCoy had the residual functional capacity to perform work at all exertional levels (i.e., sedentary, light, medium or heavy), but due to his mental impairments, he

> is limited to occasional interaction with supervisors and co-workers and must avoid all interaction with the general public, is limited to simple, routine, repetitive tasks, not performed in a fast paced production environment, involving only simple, work-related decisions and in general relatively few work place changes, and is limited to occupations that do not involve the handling, sale or preparation of alcoholic beverages or access to narcotic drugs and which are not in the medical field.

(Tr. 16.)

---

[8] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

8

He further concluded that due to his non-exertional limitations, Mr. McCoy could not perform any of his past relevant work as a landscaper helper, plastics machine operator, cleaner or gas station attendant which the vocational expert ("VE") at the hearing, Irene Montgomery, Ph.D., had described as light to heavy, unskilled or semi-skilled work. (Tr. 21; *see also* Tr. 283.)

In response to the ALJ's hypothetical question at the hearing, Dr. Montgomery had testified there were numerous unskilled jobs which an individual of Mr. McCoy's education, experience, and non-exertional limitations could perform in the local or national economy; she provided the examples of custodian/floor buffer, laundry laborer, and recycling worker. (Tr. 22; *see also* Tr. 295.) Based on Plaintiff's status as a younger individual[9] with a high school education, a history of work which did not provide transferrable skills, the medical evidence of record, and the testimony of Plaintiff, his wife, landlord, and the VE, the ALJ determined at step five that Mr. McCoy not disabled and, consequently, not entitled to benefits. (Tr. 22-23.)

B.    Summary of the Evidence

1.  *Evaluating Mental Impairments:* Plaintiff's arguments in support of his motion for summary judgment require us to first consider the medical evidence of record in light of the special

_____

[9]    Plaintiff was 47 years old on at the time of the hearing, making him a "younger" person according to Social Security regulations.    20 C.F.R. §§ 404.1563(c) and 416.963(c).

technique the Social Security Administration has developed for reviewing evidence of mental disorder claims. As noted above, Judge Mulrooney considered Plaintiff's conditions under Listings 12.04, affective disorders, 12.06, anxiety-related disorders, and 12.09, substance addiction disorders. (Tr. 17.) Listing 12.09 pertains to "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." In order to determine if the Listing is satisfied, the ALJ considers the individual's symptoms according to nine other Listings; if one or more of those Listings is satisfied and there is evidence of substance abuse, the claimant also satisfies Listing 12.09. The relevant Listings here are 12.04, 12.06 and 12.08, personality disorders. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.09.

Listings 12.04 and 12.06 in turn set out three categories which measure the severity and effects of the claimant's impairment, commonly referred to as the A, B, and C criteria. The "A criteria" require the claimant to show the medically documented persistence of one or more depressive, manic, bi-polar or anxiety-related syndromes, marked by combinations of particular traits. To satisfy the "B criteria," the claimant's mental impairment must be of such severity that it results in at least two of the following:

"marked"[10] restrictions in activities of daily living; marked

difficulties in maintaining social functioning; marked difficulties

in maintaining concentration, persistence, or pace; or repeated

episodes of decompensation, each of extended duration.[11]

To satisfy the "C criteria" of Listing 12.04, the claimant

must present medical evidence that his affective disorder has

lasted at least two years and has resulted in "more than a minimal

limitation of ability to do basic work activities." The symptoms

or signs of the affective disorder must be currently attenuated by

medication or psychosocial support. The C criteria of Listing

---

[10] "Marked" is defined as "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Listing 12.00C, *citing* 20 C.F.R. §§ 404.1520a and 416.920a.

[11] The phrase "episodes of decompensation" is defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household). . . . The term 'repeated episodes of decompensation, each of extended duration'. . .means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If [the claimant has] experienced more frequent episodes of shorter duration, or less frequent episodes of longer duration, [the SSA] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." Listing 12.00C.4.

11

12.04 also require the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement. The "C criterion" of Listing 12.06 is slightly different, requiring the claimant to show a "complete inability to function independently outside the area of one's home."

To meet Listing 12.04, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria, and to satisfy Listing 12.06, he must satisfy the A criteria and two of the four B criteria, or, alternatively, both the A and C criteria.

Listing 12.08 pertains to "inflexible and maladaptive" personality traits which "cause either significant impairment in social or occupational functioning or subjective stress." The "A criteria" for this listing include:

deeply ingrained, maladaptive patterns of behavior associated with one of the following:

1.  Seclusiveness or autistic thinking; or

2.  Pathologically inappropriate suspiciousness or hostility; or

12

3.   Oddities of thought, perception, speech and
     behavior; or

4.   Persistent disturbances of mood or affect; or

5.   Pathological dependence, passivity, or
     aggressivity; or

6.   Intense and unstable interpersonal relation-
     ships and impulsive and damaging behavior.

Listing 12.08.A.

To satisfy Listing 12.08, the claimant must satisfy one of the
A criteria and two of the B criteria, identical to those of
Listings 12.04 and 12.06.

With these paradigms in mind, we turn to the medical evidence
of record pertaining to Mr. McCoy's mental impairments,[12] followed
by a summary of the ALJ's consideration thereof.

     2.  *Medical Evidence from Treating Physicians:*  At some
point in the summer of 2001, Plaintiff had participated in a drug
and alcohol rehabilitation program at a facility known as Cove
Forge Behavioral Health System in Williamsburg, Pennsylvania.[13]  He
apparently remained sober until November 2001 when he had a

_____

[12]   Although Plaintiff refers in his brief to other conditions,
i.e., back pain from a fractured spine and arthritis in his neck,
hands and back (Plf.'s Brief at 1), he did not rest his applications
for benefits on these impairments, nor does he raise in his brief any
objections to the ALJ's decision that his pancreatitis, hypertension
and back injury were not severe.  Consequently, the Court will not
include herein references to the ALJ's detailed discussion of those
conditions (*see* Tr. 15) nor to the related medical evidence.

[13]   Although records from the summer of 2001 would be relevant to
Plaintiff's medical history inasmuch as he claimed an onset date of
June 1, 2001, no records from that period appear in the transcript.

13

"conflict" with his girlfriend, after which he "went on a two week [alcohol] binge" and began abusing valium.[14] (Tr. 206.) On December 4, 2001, Mr. McCoy voluntarily admitted himself to the behavioral health clinic at Altoona Hospital after he began experiencing suicidal thoughts with a plan to shoot himself. His Global Assessment of Functioning ("GAF") score[15] on admission was 15. His three-day treatment at that time consisted of medication, interaction with the staff, and advice from a psychiatrist that "abstaining from drugs of abuse would improve his depressive symptoms." Plaintiff expressed understanding that the prognosis for his depression was good as long as he followed recommended treatment and abstained from drugs and alcohol. (Tr. 207.) His diagnoses on Axis I when discharged were recurrent major depression, alcohol dependence, and benzodiazepine abuse prior to

---

[14] Valium (diazepam) is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal. It is one of several drugs classified as benzodiazepines. *See* drug and supplements entry at MedlinePlus.

[15] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002). A GAF rating between 11 and 20 indicates some danger of hurting oneself or others (e.g., suicide attempts without clear expectation of death) OR an occasional inability to maintain minimal personal hygiene OR gross impairment in communication. *See* the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited April 2, 2008 ("Online DSM-IV.") Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on a GAF score. *See* Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

14

admission.[16]   On Axis II, he demonstrate borderline personality traits, and on Axis V, his GAF was 59.  (Id.)

Upon discharge from the Altoona Hospital Behavioral Health Clinic, on December 6, 2001, Plaintiff expressed an intention to follow up for outpatient treatment through a facility called "Alternatives," but there are no records from such a facility in the transcript, nor from any other mental health treatment program until the spring of 2003. Between April 15 and April 17, 2003, Mr. McCoy again underwent detoxification at Cove Forge. On discharge, he was diagnosed with alcohol dependence and depression, his medical conditions (Axis III) included acute withdrawal syndrome, status post pancreatitis. Dr. Christina Doll noted addiction and "psychiatric issues" on Axis IV, and described his prognosis as poor. His GAF was 55 on discharge, up five points from that on admission. He was to receive aftercare through a facility known as White Deer Run of Altoona, but again, there is no evidence he followed up with that program or received any other treatment. (Tr. 158-160.)

---

[16]   Mental disorders are described using a five "axis" method. Axis I refers to the patient's clinical disorders which are the focus of psychiatric treatment; Axis II refers to personality or developmental disorders; Axis III to general medical conditions; Axis IV to psychosocial and environmental problems; and Axis V provides an assessment of the individual's level of functioning, often by assigning a GAF score. A score between 51 and 60 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social [or] occupational. . . functioning (e.g., few friends, conflicts with peers or co-workers)." See Online DSM-IV.

15

More than eighteen months later, Mr. McCoy again voluntarily admitted himself to the Altoona Behavioral Health Clinic on December 23, 2004. Apparently, he had contacted White Deer Run for alcohol rehabilitation and was asked during the initial assessment about suicidal ideation; when he responded that he planned to shoot himself, staff there directed him to the hospital clinic for observation. On admission, he reported his symptoms of depression had returned gradually, particularly in the last six months, with loss of appetite, changes in sleep, tremulousness, and alcohol use. He stated his current depressive symptoms were moderate and that he consumed "greater than 15 alcoholic beverages per day." (Tr. 128-129.) Mr. McCoy remained in the detox unit at the mental health clinic until December 28, 2004, when he was released, stating that he wanted to follow up with the White Deer Run program as an outpatient. An initial appointment there was scheduled for December 30, 2004; again there is no evidence that the appointment was kept, nor that he kept another outpatient appointment at the Altoona Behavioral Health Clinic scheduled for January 12, 2005. (Tr. 119.)

Plaintiff eventually consulted Dr. Quentin Dolphin at the Altoona Regional Health System Drug and Alcohol Program on May 27, 2005. In notes from the initial interview, Dr. Dolphin commented that Plaintiff had reported that during the previous two years, he had experienced "definite major depressive episodes" as the term

16

was explained to him. These episodes occurred even when he was sober, and he mentioned "vegetative symptoms." (Tr. 135.) As of the date of the interview, Mr. McCoy admitted he was drinking on a daily basis. He was having problems sleeping and was anhedonic and anergic, but Dr. Dolphin was unsure if those were symptoms of his heavy drinking or of depression. Plaintiff also described panic attacks to the point he would not go into stores or bars where there were other people because he felt "very uncomfortable" and "trapped." He was not clear about the focus of the panic attacks, but expressed fear that he would have such an attack and not be able to escape with other people around. Mr. McCoy reported that medications had helped "somewhat" in the past, but when he ran out, he did not keep appointments to have his prescriptions renewed due to transportation problems. (Tr. 136.)

Dr. Dolphin noted Plaintiff had "longish hair which is not very well groomed," a "scraggly" beard, and was "somewhat disheveled." Although Mr. McCoy stated he was quite depressed, he was able to smile, laugh and interact appropriately. He was alert and oriented times three without psychomotor agitation or retardation. At the time, he reported "absolutely no plan or intent to hurt or kill himself," although he expressed a passive wish to die, i.e., just not wake up. Dr. Dolphin noted no signs of internal preoccupation, but found his insight and judgment to be impaired. (Tr. 136.) The psychiatrist concluded that Mr. McCoy

17

was suffering from major depressive disorder, recurrent, moderate to severe without psychotic features; rule out dysthymia; panic disorder with agoraphobia, mild to moderate; and alcohol dependence. On Axis IV, he noted Mr. McCoy was not employed, was currently living with friends, and did not have "a lot of social support." His GAF at the time was 47, indicating serious symptoms including suicidal ideation or serious impairments in social or occupational functioning. (Tr. 137.) Dr. Dolphin prescribed prozac, naltrexone and trazodone,[17] ordered lab tests done, directed Plaintiff to see his primary care physician, and to return to the clinic in eight weeks. (Tr. 137.)

Dr. Dolphin also completed an employability assessment form for the Pennsylvania State Department of Welfare on May 27, 2005, indicating Mr. McCoy was temporarily disabled for the period May 28, 2005, through February 28, 2006, as a result of major depressive disorder, mild to moderate panic disorder with agoraphobia, and alcohol dependence. (Tr. 138-139.)

The next medical records from Dr. Dolphin's practice date from October 11, 2005, when Plaintiff reported to a clinical registered

---

[17] Prozac (fluoxetine) is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. Fluoxetine is one of a class of medications called selective serotonin reuptake inhibitors which work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. Trazodone is also used to treat depression by increasing the amount of serotonin. Naltrexone is used to treat narcotic or alcohol addictions; it works by blocking the effects of narcotics or by decreasing the craving for alcohol. *See* drugs and supplements entries at MedlinePlus.

nurse practitioner, Betsy Kline, that he was "doing no better at all" despite being compliant with his medications. His sleep was erratic, i.e., he sometimes slept all "all day and night" and at other times stayed awake all night. His appetite was also poor and variable. He admitted to using alcohol several times a month, stating that he did so "just to calm my nerves." Ms. Kline noted episodes of inappropriate laughter during the interview and his prozac dosage was increased. (Tr. 182.)

Plaintiff was seen thereafter on a monthly basis by Ms. Kline and was prescribed campral to help control his alcohol consumption. In February 2006, during an assessment of his mental status by Dr. Elliott Rosencrantz, he reported that he was "all right," but could not "shake the depression" and still did not like being around other people. He stated he was "sleeping okay" and his appetite was "not bad." Dr. Rosencrantz reiterated the diagnoses at that time of moderate major depressive disorder, moderate panic disorder with agoraphobia, and alcohol dependence. (Tr. 177-178.) Plaintiff was directed to return in four weeks, but did not keep his March 27, 2006, appointment. (Tr. 176.)

In the final medical note by Ms. Kline dated April 28, 2006, she noted Mr. McCoy was experiencing increased anxiety about his elderly mother who had been in the hospital for more than two weeks. He was trying "to keep her place up [and] be there for her." His sleep and appetite were better and he was exercising.

19

At that point, he had not consumed any alcohol for four weeks except "a beer every now and then." His mental status exam was unremarkable except for a subdued mood and constricted affect. He was directed to return in eight weeks. (Tr. 175.)

3. *Other Medical Evidence:* On August 9, 2005, Dr. Paul Perch, a state agency examiner, reviewed Mr. McCoy's medical records as of that date. Dr. Perch categorized Plaintiff's condition as a personality disorder, evidenced by "inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress," in particular, "persistent disturbances of mood or affect" and "pathological dependence, passivity or aggressivity." (Tr. 147.) He also found evidence of substance addiction disorders. (Tr. 148.) He concluded Plaintiff showed only mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. There was no medical evidence of more than two extended episodes of decompensation. (Tr. 150.)

Dr. Perch also completed a residual functional capacity assessment of Plaintiff's ability to sustain work activity on an ongoing basis. He concluded Plaintiff was, at most, no more than moderately limited in his ability to understand and remember detailed instructions or to carry out such instructions. He was also moderately limited in his ability to accept instruction and

respond appropriately to criticism from supervisors; get along with coworkers or peers; or respond appropriately to changes in the work setting. (Tr. 154-155.) He concluded that Plaintiff's limitations were associated with his diagnoses of polysubstance abuse and dependence. While he might not be able to perform complex tasks, his ability to perform "simple 1-2 step routine" tasks was not significantly limited. This conclusion was based in part on Mr. McCoy's ability to perform basic activities of daily living, shop, clean, take public transportation, and make decisions. (Tr. 156.)

4. *The ALJ's Summary and Analysis of the Medical Evidence:* As noted above, the ALJ concluded that Plaintiff's severe impairments included major depressive disorder, dysthymia, panic disorder with agoraphobia, alcohol dependence, and opiate and benzodiazepine abuse. He noted, however, that "the medical evidence does not contain the objective signs, symptoms or findings, or the degree of functional limitations, necessary for the claimant's impairments, considered singly or in combination, to meet or equal the severity of any subsection of [Listing 12.00] or any other section contained in Appendix 1." (Tr. 16.) He also noted "no treating or examining medical source has stated the claimant has an impairment or combination of impairments that meets or equals the criteria of any listed impairment." He then briefly summarized Plaintiff's mental health treatment history, referring to all the relevant exhibits in the record. (Id.)

21

In the portion of his analysis in which he determined Plaintiff's residual functional capacity, the ALJ apparently accepted without question the medical evidence establishing that Mr. McCoy's major depression and anxiety-related disorders satisfied the A criteria of Listings 12.04 and 12.06 respectively. In analyzing the B criteria common to both those Listings, he concluded that Plaintiff showed only mild limitations in activities of daily living, based on his reported ability in a questionnaire dated July 16, 2005, to live alone in an apartment, clean, shop, prepare meals in the microwave, and handle his own finances. (Tr. 17, *citing* Tr. 100-104.) He also commented on Mr. McCoy's ability to care for his personal hygiene, referring to notes from Dr. Dolphin and Plaintiff's other health care providers. He further noted several statements made by Mr. McCoy at the hearing about his daily activities such as washing dishes, doing laundry, preparing meals in the microwave, watching television, doing occasional yard work, attending Alcoholics Anonymous ("AA") meetings three times a week, and occasionally going out to purchase beer. (Tr. 17.)

Judge Mulrooney concluded that Mr. McCoy demonstrated marked limitations in social functioning, as evidenced by problems getting along with others, having only a few friends, having difficulty going out in public, and experiencing panic attacks when forced to do so. The ALJ based this conclusion on medical notes from Dr. Dolphin in which he diagnosed Mr. McCoy with panic disorder with

22

agoraphobia of mild to moderate severity and his description in May 2005 as pleasant, cooperative, interactive, with the ability to maintain appropriate eye contact, smile, and laugh.[18]   He also considered the progress notes from the Altoona Behavioral Health Clinic and Plaintiff's own testimony, along with that of his landlord and estranged wife, and Mr. McCoy's interaction and communication at the hearing in which he did not display "any overt anxiousness or anxiety."   (Tr. 17-18.)

With regard to any difficulties in maintaining concentration, persistence or pace, the ALJ concluded Mr. McCoy demonstrated moderate limitations.  He noted Plaintiff's self-reported ability to read and to complete projects or activities despite problems understanding and carrying out instructions.  He noted medical records which repeatedly described Mr. McCoy as alert and oriented in three spheres; conversely, there was no mention in the record of problems with concentration, attention, memory, or persistence.  At the hearing, Plaintiff demonstrated no inability to remember relevant information and was able to answer all questions without any overt problems.  (Tr. 18.)

Finally, the ALJ concluded that Plaintiff had not experienced repeated episodes of decompensation of an extended duration.  That

---

[18]   The ALJ refers to Exhibit 5F, the RFC capacity assessment by Dr. Perch dated August 9, 2005, for these findings, a reference which is clearly erroneous.  Based on the points mentioned, we conclude that the ALJ was actually referring to the initial psychiatric evaluation prepared by Dr. Dolphin on May 27, 2005, Exhibit 2F, Tr. 134-137.

23

is, he was hospitalized for three days in December 2001 and five days in December 2004; there was no evidence that he had ever lived in a halfway house or other highly supportive living arrangement, nor that he received frequent, ongoing mental health counseling or therapy. (Tr. 18.)

The ALJ then turned to the C criteria, determining that there was no evidence that Plaintiff satisfied the criteria of either Listing 12.04 or 12.06. (Tr. 18-19.) In particular, he considered Mr. McCoy's testimony that he was unable to go out in public and stayed for days in his room because of his panic attacks. The ALJ noted however, that Plaintiff was able to attend AA meetings, go out to buy beer, and file his own applications for DIB and SSI benefits; moreover, there were no references to observed panic attacks in the medical notes. (Tr. 19.)

The ALJ also properly noted that determination of a claimant's RFC requires evaluation of his or her testimony and subjective complaints. He concluded that although Plaintiff's medically determined impairments could reasonably be expected to produce the symptoms which he alleged, his "statements concerning the intensity, duration and limiting effects of [his] symptoms are not entirely credible and are inconsistent with the totality of the evidence." (Tr. 19.) He arrived at this conclusion after comparing the testimony from Plaintiff, his wife, and landlord about Mr. McCoy's refusal to leave his room, poor hygiene, and

24

refusal to eat with clinical and objective medical findings which did not reflect a person experiencing such severe, debilitating symptomatology. (Tr. 19-20.) He further considered Plaintiff's activities of daily living, his medications, and treatments such as hospitalizations or participation in alcohol and drug abuse rehabilitation programs.[19]

## C. Plaintiff's Arguments

Plaintiff raises three arguments in his brief in support of the motion for summary judgment. (Doc. No. 11, "Plf.'s Brief.") First, the ALJ erred at step two of the analysis by finding that Mr. McCoy's mental impairments did not satisfy the relevant Listings. (Id. at 7-9.) Alternatively, even if the severity of Plaintiff's impairments did not rise to the level of a Listing, the ALJ erred by failing to consider whether Plaintiff could meet the basic demands of competitive unskilled work as described in Social Security Ruling ("SSR") 85-15, "Capability to Do Other Work - The Medical-Vocational Rules as a Framework for Evaluating Solely Non-Exertional Impairments."[20] (Id. at 11.) Finally, the ALJ erred in

---

[19] We note for the record that the ALJ did not make a determination as to Listing 12.08 as it pertains to Plaintiff's substance addiction disorder, Listing 12.09. However, Plaintiff does not raise any objections in this regard and, as discussed above, the Court concluded the medical evidence did not establish that Plaintiff satisfied two of the four B criteria also applicable to Listing 12.08.

[20] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied

25

his credibility determination by failing to consider Plaintiff's long, productive work record. (Id. at 10.)

      1. *Plaintiff's Objections to the ALJ's Determination of His Limitations as to the B Criteria:* Plaintiff does not dispute the ALJ's conclusion that he demonstrated marked limitations in social functioning, but did not satisfy the B criterion related to repeated episodes of decompensation or the C criteria of either Listing 12.04 or 12.06. (Plf.'s Brief at 3.) He does object, however, to the ALJ's conclusion that his activities of daily living, the first B criterion, were no more than mildly limited and argues that the ALJ's analysis of that criterion "sorely missed the mark" in a number of ways. (Id. at 6-9.)

The SSA defines activities of daily living as

> adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

Listing 12.00C.

In a questionnaire completed on July 16, 2005, Plaintiff reported that he:

---

upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

- lived alone in an apartment;

- did not need special help or reminders to take care of his grooming and hygiene;

- cleaned his home by doing such things as dusting, vacuuming, and scrubbing floors;

- did his own shopping, stating, "I get what I need and make sure I get my correct change;"

- prepared microwavable meals, not necessarily because he could not do more elaborate cooking but because he did not have a stove or oven;

- stated he did not drive but could use public transportation were it not for his anxiety attacks; and

- could handle his own bills.

(Tr. 100-104.)

In his testimony given at the hearing on July 11, 2006, just a year later, Mr. McCoy testified that he:

- lived in a single room in a private home (Tr. 271-272);

- used the microwave in the kitchen of the home (Tr. 272);

- did lawn work "every now and then" when he was asked, including being the "regular lawnmower" (Tr. 272-273);

- had difficulty going to a doctor's office or grocery store, but could go out to buy beer because he was quickly "in and out" of the shop (Tr. 269-270);

- took care of his room, but not the house in which he lived (Tr. 250);

- did his own dishes and laundry (Tr. 250);

- stopped reading the newspaper, not from lack of interest, but because he could not pay for it (Tr. 253); and

- went to AA meetings three times a week (Tr. 256).

Conversely, he further testified that he:

27

- did not help with cleaning house, cook or join the family at meals on a consistent basis (Tr. 273);

- did not come out of his room "at least a couple of days" a week (Tr. 274);

- had poor dental hygiene, i.e., he had broken two teeth within the last week preceding the hearing (Tr. 274-275);

- had poor overall hygiene, i.e., refused to shower for days at a time (Tr. 260); and

- slept an average of 12 to 16 hours a day (Tr. 292).

Plaintiff contends that the ALJ's conclusion that he suffers only mild restrictions in activities of daily living is not supported by substantial evidence for three reasons, the first of which is the ALJ's reference to the fact that Mr. McCoy lives in an apartment.

We agree that the ALJ stated in the present tense that Plaintiff "lives in an apartment" (Tr. 17) whereas the evidence seems to show[21] that in July 2005, he lived in an apartment but at the time of the hearing, he lived with another family. There appears to be no evidence in the record to explain why he made this decision, but he did testify that the cost to rent his room was only $75 a month (Tr. 264) which could reasonably be assumed to be far less than the cost of renting an apartment. On the other hand, there is no evidence to show that he did so because he needed a

---

[21]  We conclude the evidence on this issue is very inconsistent. In December 2001, he reported he was living with his mother. (Tr. 206.) In Dr. Dolphin's notes of May 27, 2005, there is a reference to Plaintiff living with friends (Tr. 137), contrary to his statement in the questionnaire of July 2005 that he lived in an apartment (Tr. 100.)

28

more supportive living arrangement.²² However, we find the ALJ's misstatement about Plaintiff's living arrangements an insufficient basis for an award of benefits or even remand because the ALJ was otherwise correct in finding that Plaintiff "washes dishes, does the laundry, prepares microwavable meals, watches television, occasionally does yard work, attends Alcoholics Anonymous three times a week, and occasionally goes out to purchase beer" (Tr. 17), all of which, as noted above, are based on Plaintiff's testimony at the hearing.

Plaintiff also argues that the ALJ erred by stating that Plaintiff's health care providers had not commented about his grooming and appearance, in particular, mis-quoting Dr. Dolphin to the effect that his hair was well groomed. In fact, according to Plaintiff, he has failed to maintain dental care, his beard and hair are frequently not groomed, and he refuses to bathe for several days at a time. (Plf.'s Brief at 7-8.)

Again, we agree that the ALJ misstated part of Dr. Dolphin's objective examination report on May 27, 2005. The doctor actually stated "the patient has longish hair which is not very well groomed. He has a "scraggly" beard. He is somewhat disheveled." (Tr. 136.) The only other notes Court was able to find pertaining

²² Plaintiff does not point to, and the Court has been unable to independently identify, evidence in the record to support his arguments that he "cannot handle the activities of daily living without the continued assistance of the family in whose home he resides, his former wife and his teenage daughter" or that the family with whom he lives does his laundry. (Plf.'s Brief at 7.)

29

to Mr. McCoy's grooming date first from December 5, 2001, when he checked himself into the Altoona clinic, where the notes from his initial evaluation include a reference to "clean long hair." (Tr. 210.) On October 11, 2005, Ms. Kline reported that Plaintiff appeared for therapy dressed in "jeans and a jacket" (Tr. 182) and on April 28, 2006, Ms. Kline stated that Mr. McCoy was casually dressed with a full beard. (Tr. 175) In neither case did she refer to any problems of substandard cleanliness which would be indicative of a person who was so depressed he could not care adequately for himself. In fact, the Court has carefully reviewed the entire medical record and finds no references to the severe problems of personal hygiene to which Plaintiff and his witnesses testified at the hearing.

Finally, Plaintiff points to the ALJ's statements regarding his ability to prepare microwave meals and to do occasional yard work. (Plf.'s Brief at 7, see also Tr. 20.) We find no error in this regard since Plaintiff clearly testified at the hearing that he used the microwave in the kitchen of the home (Tr. 272) and did lawn work "every now and then" when he was asked, including being the "regular lawn mower" (Tr. 272-273.) We recognize that Mr. McCoy's landlord testified he had not done yard work or helped with housecleaning for more than a year before the hearing, and that Plaintiff's room was not always "in decent shape." (Tr. 290, 292.) However, determination of which witness's testimony to accept is

30

clearly within the purview of the adjudicator. *See* Holiday v.
Barnhart, No. 03-1205, 2003 U.S. App. LEXIS 20425, \*7-\*8 (3d Cir.
Oct. 6, 2003), *quoting* Dardovitch v. Haltzman, 190 F.3d 125, 140
(3d Cir. 1999) for the principle that because "the credibility of
witnesses is quintessentially the province of the trial court," a
reviewing court will defer to an ALJ's credibility determinations.

In sum, the evidence does not support Plaintiff's argument
that due to depression, anxiety and panic attacks, he is a
"prisoner in his room, ignoring personal hygiene and refusing to
come out even to eat."[23] (Plf.'s Brief at 8.) We conclude the ALJ
did not err in finding that Plaintiff demonstrated only mild
limitations in his activities of daily living.

Plaintiff also argues that with regard to the third B
criterion -- concentration, persistence or pace -- the ALJ's
conclusion that he demonstrated only moderate limitations is
erroneous. To the contrary, Plaintiff contends deficiencies in
this area lead to "frequent failure to complete tasks on a timely
basis." He is "rarely focused and is quite forgetful. He cannot
follow through with projects and has been unable in recent years to
maintain a job for more than several weeks." He "no longer reads
and does not consistently take his medication." (Plf.'s Brief at

---

[23] The Court notes that on December 8, 2005, Mr. McCoy was 5 feet
11 inches tall and weighed 219 pounds. (Tr. 172.) On January 19,
2006, he weighed 226 pounds. (Tr. 164.) This evidence does not seem
consistent with a person who refuses to eat for days at a time.

31

9.) Again, we find the AlJ's conclusions regarding Plaintiff's limitations in this area are based on substantial evidence.

Referring to the questionnaire completed in July 2005, the ALJ noted that Mr. McCoy "loved to read and was able to complete projects and activities." (Tr. 18, *see also* Tr. 102, where Plaintiff stated with regard to daily planning, keeping appointments, etc., "I do what I need to do when I feel like doing it.") He also referred to the fact that Plaintiff was described by psychiatrists in December 2004 and May 2005 as alert and oriented in three spheres. (Tr. 18, *see also* Tr. 120 and 136, respectively.) Moreover, despite his testimony that he had difficulty concentrating, is forgetful, and does not retain what he reads, the ALJ noted Plaintiff was able to remember relevant information and answer questions at the hearing without any overt problems with attention, concentration or memory. (Tr. 18.)

Plaintiff does not cite to the record for his assertions that he frequently fails to complete tasks on time, "cannot maintain appointments, often simply refusing to attend," and does not consistently take his medicine. Despite a review of the medical records, the Court is unable to find such references therein. In fact, Plaintiff reported to Dr. Dolphin in December 2004 that the reason he had stopped taking his medications was because he had problems with transportation and, presumably, could not get prescriptions refilled. (Tr. 136.) He told Ms. Kline on October

32

11, 2005, that he was compliant with his medications. (Tr. 182).
He reported to Dr. Rosencrantz on February 28, 2006, that he missed
taking his medication about once a week, but did not state a reason
why he did so. (Tr. 177.) There is significant evidence in the
record that Mr. McCoy did not keep appointments (e.g., Tr. 119,
158, and 181), but no evidence that he "refused" to do so for
psychological reasons.

Under the substantial evidence standard which this Court is to
apply in considering the findings of the ALJ, we must determine if
there is "such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion." Hartranft v. Apfel, 181 F.3d
358, 360 (3d Cir. 1999). Although substantial evidence is more
than a mere scintilla, it need not rise to the level of a
preponderance. Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 545
(3d Cir. 2003). Here, there may be, as Plaintiff argues, evidence
that he is limited in his abilities to cope with activities of
daily living and maintain adequate concentration, persistence and
pace, but there is also considerable evidence that he is not as
limited as he claims. Under those circumstances, even if this
Court would have decided differently the matter differently, we may
not set aside a determination which is supported by substantial
evidence. Pevarnik v. Comm'r of Soc. Sec., No. 07-1663, 2008 U.S.
App. LEXIS 6700, *2-*3 (3d Cir. Mar. 28, 2008); Hartranft, id.
Plaintiff's argument that the ALJ erred in finding he did not

33

demonstrate marked limitations in two of the four B criteria of Listings 12.04 or 12.06 must therefore fail.

2. *The ALJ's Failure to Properly Apply Social Security Ruling 85-15:* As Plaintiff points out, Social Security Ruling 85-15 explains that

the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This in turn would justify a finding of disability because even favorable age, education or work experience will not offset such a severely limited occupational base.

(Plf.'s Brief at 9-10.)

Plaintiff argues that even if his limitations are insufficient to satisfy Listing 12.04 or 12.06, the ALJ failed to recognize that he cannot meet the basic demands of competitive unskilled work. This argument is based on the fact that he has tried several jobs since his disability onset date of June 1, 2001, but has not been able to keep them because he cannot carry out instructions properly or respond appropriately to supervision. (Plf.'s Brief, id.)

In his July 2005 questionnaire, Plaintiff stated that in the past he usually reported to work on time, did not have good attendance because "some days I didn't want to be around people," was generally able to keep up with his work, but sometimes was unable to concentrate for extended periods of time. (Tr. 103.) He

34

further stated he had trouble getting along with supervisors and/or co-workers, explaining that "if I liked you I was fine. If I didn't, I wouldn't talk to them." He was able to accept changes at work which affected his job (Tr. 104), but had been fired on at least two occasions (Tr. 102.)

There is no medical evidence in the record for the period June 2001 through July 2004 which sheds light on Plaintiff's ability (or inability) to work, even though his earnings report shows he held at least six short-term jobs during that time. In a work activity report dated June 3, 2005 (Tr. 72-81), Mr. McCoy stated he had stopped working entirely as of July 15, 2004, because of panic attacks (Tr. 86), yet the first medical evidence of panic attacks appears in Dr. Dolphin's notes from May 2005. Moreover, contrary to Plaintiff's argument that "the overall scope of the evidence shows that [he] cannot meet the basic demands of competitive unskilled work" (Plf.'s Brief at 9), even his own testimony fails to establish that he left previous jobs because he was unable to carry out instructions properly, respond appropriately to co-workers and usual work situations, or deal with changes in a routine work setting. Mr. McCoy testified he left one job as a maintenance worker because he "just got tired of cleaning everybody's trash" (Tr. 263) and quit his job with Springfield Plastics Company because a supervisor yelled at him (Tr. 244), a statement which is contradicted by the work activity report in

35

which he stated he left that job in October 2001 because he moved to a different town. (Tr. 73.) He testified he left Niagara Plastics in 2002 because "they closed the plant" (Tr. 245), again contradicting the report in which he stated he quit that job in April 2003 because of his medical condition. (Tr. 77.) On the other hand, there was some evidence he was unable to get along with supervisors, e.g., his wife testified that "he gets angry when told he's not doing something right," and that he left his job with a lawn care service company because of a disagreement with the owner about having child support payments withheld. (Tr. 283.)

As specifically recognized in SSR 85-15,

[s]ince mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings. Determining whether these individuals will be able to adapt to the demands or "stress" of the workplace is often extremely difficult. This section is not intended to set out any presumptive limitations for disorders, but to emphasize the importance of thoroughness in evaluation on an *individualized basis*.

(SSR 85-15, emphasis added.)

When defining the hypothetical question for Dr. Montgomery at the hearing, the ALJ directed her to:

[a]ssume for me, please, a hypothetical individual with this Claimant's past education, training and work experience and assume. . .the person was limited to simple routine repetitive tasks not performed in a fast paced production environment found in only [sic] simple work-related decisions and in general relatively few work place changes. Assume. . .the person was limited to occupations that require no more than occasional interaction with supervisors and co-workers and by

36

interaction I don't just mean being at the same place and same time with people I mean actually having to substantively interact with them. Assume, please, that the person was limited to occupations where he must avoid all interactions. . .with members of the general public. Assume the person is limited to occupations which do not involve the handling, sale or preparation of alcoholic beverages or access to narcotic drugs and which are not in the medical field.

(Tr. 293-294.)

We conclude that this hypothetical question adequately identifies Plaintiff's limitations which are supported by the medical evidence. The ALJ accounted for Plaintiff's moderate limitations in concentration, persistence and pace by excluding jobs which are "performed in a fast paced production environment." He further considered the fact that Mr. McCoy was limited to "simple routine repetitive tasks. . .simple work-related decisions and in general relatively few work place changes." He addressed Plaintiff's marked social limitations by excluding substantive interaction with supervisors, co-workers and the public. He excluded positions involving alcoholic beverages or narcotic drugs and in the medical field, again taking into account Plaintiff's individual characteristics.

The question did not incorporate limitations such as panic attacks, reclusiveness, and the need to sleep 12 to 16 hours a day, but the medical evidence does not support these limitations. *See* Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999) (a proper hypothetical question need only incorporate those "credible

37

limitation[s] established by the physical evidence.") As the ALJ pointed out, "the clinical and objective findings are inconsistent with an individual experiencing such debilitating symptomatology." (Tr. 20.) He further noted that while Plaintiff has at times been depressed with a restricted affect, there are numerous references to his ability to interact appropriately and positively with medical staff and to the fact that when he is compliant with his medications and avoids alcohol and drugs, his mental status examinations have been unremarkable. (Id., *see also* Tr. 179, 180.)

Although the ALJ did not explicitly refer to SSR 85-15 in his opinion, his analysis correctly follows the guidelines therein. (*See* Tr. 22.) In short, he referred to Rule 204.00 but properly concluded although Plaintiff could perform at all exertional levels, the Rule was not controlling because Mr. McCoy had non-exertional limitations which would reduce the expected occupational base. Consequently, he received testimony from an impartial vocational expert who testified as to the existence and availability of jobs which a person with Plaintiff's limitations could perform. We conclude that the hypothetical question posed to the Vocational Expert, incorporating a "highly individualized" description of all of Mr. McCoy's limitations which were supported by the medical evidence, satisfied the requirements of SSR 85-15.

3. *Failure to Consider Plaintiff's Work History:* Finally, Plaintiff argues that in light of his 15-year work record,

38

including six years with the same employer, the ALJ erred by finding his testimony less than credible. (Plf.'s Brief at 10.) Again, we conclude the ALJ did not err in this regard.

It is well-established that a claimant with a long, productive work history will be given "substantial credibility" when describing his work limitations, assuming those limitations are also supported by the medical evidence. In the precedential case on this issue, the plaintiff had worked as a meat cutter, despite repeated hospitalizations for ischemia and coronary insufficiency. He was also diagnosed with degenerative disc disease, lumbosacral strain, cervical strain, sciatic neuritis, and hypertension. Dobrowolsky v. Califano, 606 F.2d 403, 404 (3d Cir. 1979). After his release from the hospital following an automobile accident, Dobrowolsky attempted to work for another year, but could do so only sporadically because of his medical conditions. At his hearing, Dobrowolsky testified that recurrent pain prevented him from performing even light work. The Third Circuit Court of Appeals concluded that:

   testimony of subjective pain and inability to perform
   even light work is entitled to great weight, particularly
   when, as here, it is supported by competent medical
   evidence. Moreover, when the claimant has a work record
   like Dobrowolsky's twenty-nine years of continuous work,
   fifteen with the same employer, his testimony as to his
   capabilities is entitled to substantial credibility.

39

<u>Dobrowolsky</u>, 606 F.2d at 410.[24]

A claimant's work history is one of many factors an ALJ must consider in assessing a claimant's subjective complaints.  20 C.F.R. § 404.1529(c)(3); <u>Telesha v. Barnhart</u>, CA No. 01-2371, 2003 U.S. Dist. LEXIS 16359, *28, n.6  (M. D. Pa. Mar. 31, 2003).  An ALJ is not required to discuss every piece of evidence in the record, nor is he required to equate a long work history with credibility.  <u>Brubaker v. Barnhart</u>, CA No. 05-76, 2005 U.S. Dist. LEXIS 36790, *12 (E.D. Pa. Dec. 29, 2005); *see also* <u>Phillips v. Barnhart</u>, No. 03-2236, 2004 U.S. App. LEXIS 4630, *14 n.7 (3d Cir. Mar. 10, 2004) (the failure of the ALJ to cite specific evidence does not necessarily establish that such evidence was not considered.)

In his decision, Judge Mulrooney did not explicitly refer to Plaintiff's work history as part of his credibility determination, but a review of Mr. McCoy's earnings report shows that with a few short exceptions, Plaintiff worked regularly from 1975 through 2000.  (Tr. 65.)  He also worked intermittently in 2001 through 2004, periods which the ALJ discussed extensively with Mr. McCoy at

---

[24] See also <u>Taybron v. Harris</u>, 667 F.2d 412-413 (3d Cir. 1981); <u>Podeworney v. Harris</u>, 745 F.2d 210, 213 (3d Cir. 1984); <u>Sidberry v. Bowen</u>, 662 F.Supp. 1037-38 (E.D. Pa 1986); <u>Murgia v. Bowen</u>, CA 87-2789, 1988 U.S. Dist. LEXIS 1350, *2, *7 (E.D. Pa. Feb. 16, 1988); <u>Rieder v. Apfel</u>, 115 F. Supp.2d 496, 505 (M.D. Pa. 2000); <u>Jackson v. Barnhart</u>, CA No. 02-4458, 2003 U.S. Dist. LEXIS 13912, *23 (E.D. Pa. Aug. 4, 2003); and <u>Lang v. Barnhart</u>, CA No. 05-1497, 2006 U.S. Dist. LEXIS 95767, *33-*36 (W.D. Pa. Dec. 6, 2006), all following <u>Dobrowolsky</u> in similar work-history situations.

40

the hearing (Tr. 242-247) and characterized as unsuccessful work attempts in his opinion. Thus, one may easily infer that the ALJ had considered Plaintiff's work history as part of his review of the application file.

Moreover, some courts have distinguished Dobrowolsky where conflicts in the evidence undercut the claimant's credibility, even if the ALJ failed to explicitly discuss work history in the opinion. See, e.g., Mylod v. Barnhart, CA No. 04-5795, 2006 U.S. Dist. LEXIS 27461, *7-*8 (E.D. Pa. May 9, 2006); Stroman v. Barnhart, CA No. 03-4045, 2004 U.S. Dist. LEXIS 15372, *14-*15 (E.D. Pa. July 24, 2004). Here, consistent with SSR 96-7p and 20 C.F.R. §§ 404.1529(3) and 416.929(3), the ALJ stated that in determining Plaintiff's credibility, he had considered Mr. McCoy's demeanor during the hearing as well as his testimony and that of his two witnesses; the medical evidence which was inconsistent with the severity of the symptoms Plaintiff claimed to experience; his activities of daily living, medications, and treatments other than medication. He explained in detail the reasons for finding Plaintiff's testimony less than credible. (Tr. 19-21.)

Credibility determinations are uniquely the province of the adjudicator and this Court will generally not disturb such decisions. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). This is particularly true where the ALJ has identified the evidence and reasoning which support his decision. See Horodenski v. Comm'r

of Soc. Sec., No. 06-1813, 2007 U.S. App. LEXIS 2874, *15 (3d Cir. Feb. 7, 2007) (where the ALJ has articulated reasons supporting a credibility determination, that determination is entitled to great deference and will be reversed only in extraordinary cases.) We conclude that the internal inconsistencies in Plaintiff's testimony plus the inconsistencies between the medical evidence and his statements provide more than sufficient evidence to support the ALJ's finding that Mr. McCoy's descriptions of his impairments and his inability to work were not fully credible.

Having considered each of the arguments raised by Plaintiff in his brief in support of the motion for summary judgment, we conclude that none of them is persuasive or provides the basis for further consideration. Plaintiff's motion is therefore denied. An appropriate order follows.

April ___/5__, 2008

William L. Standish
United States District Judge

cc: Counsel of Record

42